IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ADAM GALLIHER, JR,<br><br>Defendant. | Cause No. CR 18-11-H-BMM<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |

The Government charges Defendant Adam Galliher, Jr. ("Galliher") with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) Galliher filed a Motion to Suppress. (Doc. 99.) He asserts that law enforcement obtained various statements, observations, and pieces

1

of evidence as the result of an unlawful stop. (*Id*. at 2.) The Government opposes. (Doc. 103.) The Court held a hearing on July 21, 2020. (Doc. 110.)

## BACKGROUND

Montana State Probation and Parole Officers Monte Warrington and Jason Sexton were checking the residence, owned by one of their supervisees, at 3310 Olsen road in Helena, Montana. The house sits in a rural and isolated area located near only two other residences and a fishing access site on Prickly Pear Creek. (*See* Doc. 103-1.) Warrington and Sexton requested that dispatch send law enforcement assistance to this residence. (Doc. 103 at 2.) Warrington and Sexton had witnessed an unknown man get out of a parked car and walk quickly into the residence before law enforcement assistance arrived. (*Id*. at 3.) Before entering the house, the man briefly engaged with the probation officers, telling them he would get the homeowner. (*Id*. at 2.) Lewis and Clark County Sheriff's Deputy Greg Holmlund arrived at the residence at approximately 2:36 p.m. (Doc. 100 at 3.) Sexton described the man to Holmlund as approximately six feet tall with reddish blonde hair and a beard. (Doc. 103 at 2.)

Holmlund, Warrington, and Sexton met with a woman named Jennifer Sanders at the front door of the house. (*Id*. at 3.) Sanders stated that no one else was home. (*Id*.) She went back inside the house, checked again, and maintained that no one else was there. (*Id*.) Holmlund testified that he is familiar with the

2

house because "the property was known to law enforcement." (Transcript at 11:12-14.) Holmlund said he had "interacted with [Sanders] frequently." (*Id.*)

The Deputy and Officers left the house. (Doc. 103 at 3.) Holmlund drove down Olsen Road to investigate the outhouse located at the fishing access site on Prickly Pear Creek approximately a hundred yards from the residence. (*Id.*) Holmlund noticed a black 2005 Honda Accord with a Montana license plate parked alone at the fishing access. (*Id.*) He saw a man in the driver's seat and a woman in the front passenger's seat. (*Id.*)

Holmlund parked his vehicle at the fishing access and immediately approached the vehicle. (Doc. 106, Ex. 506, Dashcam Video at 00:22-00:41 ("Dashcam Video").) Holmlund explained to the vehicle's occupants that he was investigating a person who may have run from the Olsen Road residence. (*Id.* at 00:49-00:55.) He asked the occupants for identification, explaining that he wanted to document their presence at the site. (*Id.* at 00:58-1:58.) The occupants did not produce identification, but told him their names and dates of their birth. (*Id.*) Holmlund told the occupants to "hang tight" before he walked away from the vehicle. (*Id.* at 2:03.)

Warrington and Sexton arrived at the fishing access and parked their vehicle near Holmlund's vehicle. (Doc. 106, Ex. 505, Bodycam Video at 15:02:47 ("Bodycam Video").) Sexton approached the black Honda, looked inside, and told

3

Holmlund that the driver was not the person who had exited the car and ran inside the Olsen Road residence. (Dashcam Video at 2:30.) Holmlund again directed the driver to "hang tight," and then contacted dispatch to run the vehicle occupants' names. (*Id*. at 2:32.)

Dispatch informed Holmlund that Galliher had absconded from probation. (*Id.* at 4:36.) The probation office directed Sexton to arrest Galliher for violating the terms of his state probation. (Transcript at 64: 1-3.) Sexton spoke with Justin Ewing, the supervising probation officer for Galliher. (*Id*. at 63: 20.) Ewing directed Sexton to arrest Galliher. (*Id.* at 64: 1-3.) Sexton testified that if Ewing had not told Sexton to arrest Galliher, Sexton would have "probably just released him right there." (*Id.* at 64: 8-9.) Based upon Ewing's direction, the officers arrested Galliher at 3:06 p.m. for having absconded from probation. (Bodycam Video at 5:35.) Sexton and Warrington conducted a probationary search of the vehicle. (Dashcam Video at 9:49-12:51.) Galliher's probation terms allow search of his car by probation officers if they have reasonable suspicion. (Doc. 103 at 5.) The probation officers found a glass pipe containing white residue, a large quantity of plastic bags, and a pistol. (*Id*.)

After Warrington and Sexton found the contraband, Holmlund halted the probationary search in order to seize the vehicle and obtain a search warrant. (Dashcam Video at 12:52.) The probation and parole office issued a field warrant

for Galliher's arrest at approximately 4:00 p.m. after Galliher's arrest. (Transcript at 76: 22.)

Holmlund eventually obtained and executed a search warrant for the vehicle. (Doc. 103 at 6.) Holmlund found a loaded Jimenez Arms .380 caliber pistol, twenty-six .380 caliber rounds, a wad of small zip-lock bags, a digital scale, and two baggies containing a white crystal-like substance. (*Id.*) The substance tested positive for methamphetamine. (*Id.*)

A grand jury indicted Galliher for possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) Galliher filed this Motion to Suppress on the basis that Holmlund had conducted an unlawful stop. (Doc. 100 at 1.) He contends the exclusionary rule requires the Court to suppress any evidence discovered after the unlawful stop. (*Id.* at 2.)

## LEGAL STANDARD

A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The Government has the burden of providing "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct" in order to justify reasonable suspicion. *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000); *Terry v.*

*Ohio*, 392 U.S. 1, 21 (1968).

## ANALYSIS

**I.     Officer Holmlund performed a valid *Terry* stop.**

The Fourth Amendment safeguards the right of people from unreasonable searches and seizures. U.S. Const. amend. IV. An officer may, consistent with the Fourth Amendment, perform a brief investigative stop of a person without a warrant when the officer has "a reasonable articulable suspicion that criminal activity is afoot." *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Officers may ask questions during a *Terry* stop to try to obtain information confirming or dispelling the officer's suspicions. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). *Terry* stops can elevate into lawful seizures. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009).

The Court assesses the totality of the circumstances surrounding the stop to determine whether an officer possessed reasonable suspicion. *Sokolow*, 490 U.S. at 7. The Court evaluates the totality of circumstances objectively and disregards an officer's subjectivity. *United States v. Willis*, 431 F.3d 709, 716 (9th Cir. 2005). The Supreme Court has required suspicion only of "criminal activity," not necessarily a specific crime. *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also United States v. Pack*, 612 F.3d 341, 356 (5th Cir. 2010). Circumstances that may contribute to a finding of reasonable suspicion include extreme nervousness,

6

*Pack*, 612 F.3d a 345, high crime areas, *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002), and evasive movement, *Sokolow*, 490 U.S. at 8.

An officer may deduce reasonable inferences from and about the cumulative information available at the time based on their own "experience and specialized training." *Arvizu*, 534 U.S. at 273. Officers can base their inferences on information provided to them if the information conforms to the officer's specialized knowledge of a pattern of criminal activity and to the location where that activity had been occurring. *Nelson*, 284 F.3d at 482.

Deputy Holmlund initiated an investigative stop based on the totality of the circumstances and the objective information he knew at the time when he approached Galliher's car. Warrington and Sexton called Holmlund to the Olsen Road residence to assist them in their visit to a supervisee. (Doc. 103 at 2.) The probation officers informed Holmlund they saw a male with reddish hair and a red beard leave a vehicle and walk briskly into the house. (*Id.*) Sanders insisted to Holmlund the man was not in the house. (*Id.* at 3.) Holmlund had visited this house many times regarding criminal activity. (Transcript at 11: 11-14.) At that time, Holmlund knew a man had entered the house. (Doc. 100 at 8.) Sanders insisted that no one else was in the house even though the probation officers had seen the man enter the house. (*Id.*) With this information in mind, Holmlund decided to look for the man at a fishing access located next to the house. (*Id.*) Holmlund observed a

lone car sitting at the fishing access. (*Id.* at 7.)

Brisk walking and interacting with the probation officers in a suspicious way may demonstrate nervousness and evasive movements. The officers' explanation to Holmlund of this behavior likely contributed to Holmlund's reasonable suspicion. *See Pack*, 612 F.3d at 349; *Sokolow*, 490 U.S. at 8. Holmlund's frequent visits at the residence indicate Galliher's lone vehicle parked near a house known to the officers for criminal activity may have contributed to Holmlund's reasonable suspicion. *See Nelson*, 284 F.3d at 482. Holmlund relied on Warrington's and Sexton's description of evasive behavior, and his own observations of the singular vehicle at the fishing access combined with his experience dealing with criminal activity at the residence to form reasonable suspicion. *See Arvizu*, 534 at 273. At this point, Holmlund had a "particularized and objective basis" for his heightened suspicions based on the totality of the circumstances giving rise to the investigative stop of Galliher's vehicle. *See Pack*, 612 F.3d at 349; *see Nelson*, 284 F.3d at 482; *See Arvizu*, 534 at 273.

Holmlund initiated a lawful investigative stop when Holmlund approached Galliher's black Honda at the public fishing access site approximately 100 yards away from the Olsen Road residence. (Dashcam Video at 00:22-00:41.) Holmlund had reasonable and heightened suspicion when he asked Galliher and his passenger for their identification to confirm or dispel his suspicions about the red-bearded

man the probation officers initially had encountered. *See Berkemer*, 468 U.S. at 439. Once Galliher told Holmlund that he did not have his identification in the form of a Montana Driver's License, Holmlund had objective reasonable suspicion that Galliher violated Montana's traffic code, which requires a person "operating a motor vehicle" to "display the license upon demand" of law enforcement. Mont. Code Ann. § 61-5-116.

Although Holmlund never watched Galliher drive the black Honda, Holmlund likely and reasonably inferred that Galliher drove the vehicle to the fishing access. Galliher's failure to produce his driver's license allowed Holmlund reasonably to infer that Galliher had driven to the access without a driver's license and violated Montana law. *See Arvizu*, 534 U.S. at 273. Once Holmlund realized Galliher had violated the traffic code, he could detain Galliher and the vehicle to run their names. *See Rodriguez v. United States*, 575 U.S. 348, 349 (2015).

## II.     The evidence is admissible under the Attenuation Doctrine.

Even if Holmlund stopped Galliher unlawfully under the Fourth Amendment, the Court would not grant Galliher's Motion to Suppress because the evidence remains admissible under the attenuation doctrine. The exclusionary rule typically remedies Fourth Amendment violations made by law enforcement regarding evidence confiscated after the violation. The exclusionary rule forbids the use at trial of evidence obtained as direct result of an illegal search or seizure.

*Segura v. United States*, 468 U.S. 796, 804 (1984). The court in *Herring v. United States* found exclusion appropriate where the benefits of deterrence outweigh the costs of letting guilty and potentially dangerous defendants go free. 129 S. Ct. 695, 700 (2009). On the other hand, the Supreme Court has stated that courts should not suppress evidence when suppression would not serve a deterrent effect. *Brown v. Illinois*, 422 U.S. 590, 609 (1975).

The attenuation doctrine represents an exception to the exclusionary rule. *United States v. Crews,* 445 U.S. 463, 470 (1980). The attenuation doctrine aims to balance the interests of society in deterring unlawful police conduct with the interest of ensuring juries receive all probative evidence of a crime. *Nix v. Williams*, 467 U.S. 431, 442 (1984). If the attenuation doctrine applies, the Court cannot exclude evidence from trial. *Utah v. Strieff*, 136 S Ct. 2056, 2061 (2016). The applicability of the attenuation doctrine depends on three factors—temporal proximity, intervening circumstances, and the purpose and flagrancy of the misconduct. *See id.* Not all factors must weight against suppression for the attenuation doctrine to apply. *See id.*

For temporal proximity, the court examines the time between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional stop. *Id.* A space of "only minutes after the illegal stop" counsels against attenuation. *Id.* Here, the time

between Holmlund's investigative stop of Galliher and the probationary search lasted approximately nine minutes. (Dashcam Video at 00:49-10:00.) That relatively short time period favors suppression.

Second, the attenuation doctrine requires the Court to analyze the presence of intervening circumstances. Intervening circumstances stand independent from acts of "free will" on the part of defendants or witnesses. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). The court in *United States v. Crews* recognized that the applicable framework for analyzing attenuation hinges on the chain of causation proceeding from the unlawful conduct and whether it became so attenuated or interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality. 445 U.S. at 471. A lawful arrest on an outstanding warrant that precedes the unconstitutional conduct and does not connect to the unlawful stop exemplifies a sufficient intervening circumstance that attenuates the officer's prior illegality. *Strieff,* 136 S. Ct. at 2061; *see also Hudson v. Michigan*, 547 U.S. 586 (2006). Confessions also may constitute an intervening circumstance when the police have justification to question the defendant prior to their unlawful arrest. *New York v. Harris*, 495 U.S. 14 (1990). Intervening circumstances heavily weigh against suppression, but are not by themselves dispositive. *Strieff*, 136 S Ct. at 2061.

Galliher's status as an absconder acts as an intervening circumstance and

11

weighs against suppression. (Dashcam Video at 4:36.) The fact that Galliher absconded placed him under law enforcement authority before Holmlund conducted the investigative stop. Holmlund's initial reason to stop Galliher did not relate to Galliher having absconded from probation. Holmlund, instead, sought clarification on the identity of the passengers in the vehicle to determine if any relation existed between their behavior and the behavior of the suspicious man who the probation officers noticed walking into the Olsen Road residence. (Doc. 103 at 2.) The Court classifies Galliher's abscondment as an intervening circumstance, similar to an arrest warrant or confession of guilt, because all three involve potential criminal conduct distinct from the reason for the initial stop. Holmlund's discovery that Galliher had absconded from his probation during the investigative stop weighs against Galliher's Motion to Suppress. *See Strieff*, 136 S Ct. 2061.

Third, the attenuation doctrine requires the Court to look at "the purpose and flagrancy of the official misconduct." *Id*. at 2062. This factor proves particularly relevant because if the officer participates in simply negligent misconduct, the deterrent effect of suppression will be minimal. *Brown,* 422 U.S. at 604. Purposeful means that the misconduct was investigatory in design and executed in the hope that "something will turn up." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006). Flagrant means the officer knew his conduct, at the time, was obvious and likely unconstitutional but engaged in that conduct

12

nevertheless. *Id.* An officer's erroneous belief about his legal authority does not give rise to the level of flagrant misconduct and does not support suppression. *Rawlings v. Kentucky*, 448 U.S. 98, 110 (1990).

Nothing in the record suggests that Holmlund executed the investigative stop in bad faith or in a flagrant, illegal way. Warrington and Sexton asked Holmlund for assistance investigating the man whom probation initially had discovered because the man had displayed suspicious behavior near a house known to police as a location of criminal activity. (Doc. 103 at 2.) Holmlund then decided to look around the immediate area for places where the man may have gone to hide. Once Holmlund noticed a single vehicle isolated at a public site located near a house known to be suspicious, Holmlund suspected that the vehicle was related to the potential criminal activity Warrington and Sexton described.

To the extent that Holmlund lacked reasonable suspicion to conduct a stop, he had something quite close to it. Holmlund exhibited no egregious conduct with the purpose to hope that some sort of illegal activity would show up. *See Simpson*, 439 F.3d at 496. And this was not the type of fishing expedition the Court explained would prove flagrant in *Strieff*. *See* 136 S. Ct. at 2064. Holmlund conducted a targeted search of the most logical area that the man whom probation initially encountered may have gone to hide. As such, Holmlund's conduct does not rise to the level of conscious or flagrant misconduct requiring suppression of

13

the evidence pursuant to Galliher's lawful arrest based on the terms of his probation.

Accordingly, **IT IS HEREBY ORDERED** that Galliher's Motion to Suppress (Doc. 99) is **DENIED.**

DATED this 6th day of August, 2020.

_____
Brian Morris, Chief District Judge
United States District Court